**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**SCOTT JOSEPH DELAHOUSSAYE**                              **CIVIL ACTION**

**VERSUS**                                                              **NO. 10-2624**

**PISCES ENERGY, LLC, ET AL**                                    **SECTION "H" (5)**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, from October 9 through October 11, 2012. All claims between Plaintiff, Scott Joseph Delahoussaye, and Defendants Pisces Energy, LLC ("Pisces"), Richard John Boutte ("Boutte"), Crescent Drilling Foreman, Inc. ("Crescent"), Lexington Insurance Company ("Lexington") had previously been resolved. Thus, only Plaintiff's claims against Performance Energy Services, LLC ("Performance") and One Beacon Insurance Company ("One Beacon") remained before the Court.

Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

*UNCONTESTED FACTS*

1.  Pisces is the owner of Mustang Island 739-A ("MI-739-A") Platform, a fixed platform located in the Gulf of Mexico off the coast of Texas.

2.  Pisces was the operator of the MI-739-A Platform at the time of the incident.

3.  In August of 2009, Pisces determined that several of the existing production wells on the MI-739-A Platform were in need of work-over recompletion work.

4.  In order to perform the work-over recompletion work on the Platform Pisces retained several independent contractors.

5.  Pisces contracted with Crescent to provide Pisces with the services of Boutte as a Consultant.

6.  Pisces contracted with Warrior Energy Services ("Warrior"), a subsidiary of Superior Energy Services, whereby Warrior agreed to provide a crew to perform coiled tubing work and other operations on the MI-739-A Platform.

7.  Pisces contracted with Performance for the services of a crane operator for the work being performed on the MI-739-A Platform.

8.  In August of 2009, Scott Delahoussaye ("Delahoussaye") was employed by Warrior as a coiled tubing assistant, and was performing coiled tubing work on Pisces' MI-739-A Platform.

9.      On August 22, 2009 Boutte made the decision to backload some equipment from the MI-739-A Platform onto a vessel that was located adjacent to the MI-739-A Platform.

10.     During the backloading operations, Boutte ordered Delahoussaye to go onto the vessel to serve as a flagman for the crane operator, Shalico Andow ("Andow"), as he lowered equipment from the MI-739-A Platform onto the deck of the vessel.

11.     During the backloading operations Delahoussaye was injured when he was struck in the head, neck and shoulders by a piece of handrail that became dislodged.

12.     At the time of the alleged accident, the crane was being operated by Performance employee, Andow.

13.     Performance did not own the crane on the MI-739-A Platform.

14.     Andow was the only Performance employee on the MI-739-A Platform.


*EMPLOYMENT STATUS OF SHALICO ANDOW*

15.     Pisces contracted with Performance to provide a crane operator, Shalico Andow, for the work being performed by Pisces on the platform.

16.     It is commonly accepted in the offshore oil and gas industry that the American Petroleum Institute's Recommended Practices 2d ("API RP 2d") are the rules of the road for operating cranes and making lifts with a crane.

17.     Under the API RP 2d, the crane operator is the supervisor of and responsible for any work

being performed by the crane.

18. Crane operations is specialized work and the crane operator does not need any direct supervision or direction to perform his work.

19. Richard Boutte was the supervisor of the work-over recompletion work.

20. Pisces contracted with Crescent to provide a "consultant,"Richard Boutte, for the project.

21. The only person assigned to the platform from Crescent was Richard Boutte.

22. Shalico Andow received his day to day instructions and directions from Boutte.

23. Andow is paid by Perfomance. Crescent did not pay Andow <u>or</u> Performance.


*THE INCIDENT*

24. The MI-739-A was a small platform and because of that, equipment had to be moved on and off the platform regularly.

25. On August 22, 2009, in order to make more room on the platform, Boutte determined that the track stack on the MI-739-A platform needed to be loaded onto the vessel M/V Leeza Renee.

26. Prior to beginning a lift, it is incumbent upon the crane operator to have a pre-lift meeting to identify potential safety hazards and methods to address the potential hazards.

27. A very casual pre-lift meeting was held near the BOP ("blow out preventer") on the MI-739-A. In attendance were various Warrior employees, including the plaintiff, Andow the

crane operator, and Boutte, the company man.

28. During the pre-lift meeting, various people discussed the methods to move the load from the platform to the M/V Leeza Renee.

29. The lift began, and as Andow cleared the platform he stopped, issued an all stop and told everyone that he could not see the vessel and asked that the vessel back away from the platform.

30. Boutte and Andow discussed continuation of the lift. Andow wanted the M/V Leeza Renee moved so that he could visually see the vessel; Boutte vehemently disagreed and wanted the lift to proceed "as they had done the night before".

31. The night before, the parties had proceeded with a blind lift and Boutte had provided the appropriate signaling for Andow. On that evening, the lift proceeded without incident.

32. Boutte insisted that the lift be conducted as he suggested and the parties did.

33. When the lift proceeds where the crane operator cannot see the destination of the load, it is called a blind lift.

34. A blind lift, in and of itself, is not inherently dangerous.

35. During a blind lift, the crane operator must rely on a signal man to give him signals so that he can know what to do with the load since he cannot see the destination of the load.

36. The crane operator is only supposed to have one designated signal man directing him on how to proceed.

37.   However, anyone on the job can call an all stop to the crane operator which he should follow.

38.   For this lift, the designated signal man was Boutte.

39.   Boutte stood by the handrail on the MI-739-A platform while he was signaling Andow.

40.   Andow watched Boutte for hand signals during the entire lift.

41.   It is imperative during a blind lift that the signal man have a clear view throughout the entire lift.

42.   At some point during this lift, Boutte walked away from the handrail but continued to give Andow the signal to come down.

43.   Andow could see that Boutte had lost visual contact with the load for 30-45 seconds and did not have a clear view.

44.   Despite Boutte's having lost clear view, Andow continued to follow all of Boutte's hand signals.

45.   As the track stack descended, it hit other equipment on the deck of the M/V Leeza Renee and the contact jarred a handrail free which struck Scott Delahoussaye in the head and shoulder.

46.   After being struck, Delahoussaye was thrown approximately twenty (20) feet and lost consciousness.

47.   Shalico Andow then went to an adjacent platform, MI-739-B, to use a crane to bring

Delahoussaye back to the platform.

48. The Court finds as a factual matter that Richard Boutte failed to safely perform his duties as a signal man.

49. The Court finds that Richard Boutte's version of the incident was beyond belief, and that his testimony was not credible.

50. The Court further finds as a factual matter that Shalico Andow failed to exercise reasonable caution by not stopping the crane lowering when he knew the signal man had lost sight of the load.

*POST-INCIDENT MEDICAL TREATMENT*

51. As a result of the August 22, 2009 incident, Delahoussaye was injured when he was struck by a piece of hand rail and was taken to shore for medical treatment following the accident.

52. Following the accident, Delahoussaye was brought via helicopter to Palcios Community Medical Center for treatment.

53. Delahoussaye was released from the Palcios Community Medical Center on the same date.

54. On August 24, 2009, Delahoussaye sought treatment with Dr. G. Gregory Gidman at the Acadian Center for Orthopedic and Occupational Medicine.

55. Dr. Gidman found that Delahoussaye likely had a neck sprain, lumbar sprain, and a contusion to his left arm.

56. At that time, Dr. Gidman noted that neurological examination was normal.

57. On August 24, 2009, Dr. Gidman believed that Delahoussaye could immediately resume regular work activities.

58. Following his release from Dr. Gidman, Delahoussaye began treatment for pain management at Louisiana Speciality Institute ("LSI").

59. Delahoussaye treated with Dr. Stephen Wyble at LSI.

60. Dr. Wyble opined that Delahoussaye's medical condition was related to his August 22, 2009 incident.

61. Dr. Wyble has treated Delahoussaye continuously since the accident for pain management services.

62. On January 25, 2010, Delahoussaye sought treatment with orthopedic spine surgeon Dr. George Ray Williams, for his continued complaints of back pain.

63. Delahoussaye only saw Dr. Williams on two occasions - January 25, 2010 and February 28, 2011.

64. On both his visits, Dr. Williams performed neurological examinations on Delahoussaye. On both occasions his neurological examination was normal.

65. Dr. Williams diagnosed Delahoussaye with (1) degenerative disk disease, (2) a protrusion at L5-S1, (3) an annular tear, and (4) foraminal stenosis.

66. Dr. Williams has recommended that Delahoussaye undergo a one-level fusion at L5-S1.

67. His recommendation was based primarily upon Delahoussaye's subjective complaints of

pain.

68. To date, Delahoussaye has not undergone back surgery.

69. Between 2009 and 2012, several hours of surveillance footage was taken of the plaintiff. During the course of the surveillance, the plaintiff was observed performing certain tasks such as picking up ice chests, squatting with a bag of dog food on his shoulder, jumping in and out of a truck bed, lifting and carrying equipment, building a fence, trimming trees, carrying branches, unloading his truck bed, vigorously riding his son's scooter, walking, bending, stooping, running up and down steps, driving, attending a parade, dancing, catching beads, and a number of other activities.

70. During the course of the surveillance, Delahoussaye was not noted to wince, guard, limp or make any other outward expressions of pain or discomfort.

71. This Court finds as a factual matter that Delahoussaye has sustained a back injury at L5-S1; however, the Court finds that Delahoussaye has exaggerated his complaints of pain.

72. The Court finds as a factual matter that Delahoussaye is not a candidate for L5-S1 fusion but may require minimal future medical treatment with pain management.

73. As a result of the August 22, 2009 incident, Delahoussaye sustained medical expenses in the amount of $67,528.49.

74. The Court finds as a factual matter, that Delahoussaye will require certain future medical expenses to include periodic visits with his physician, periodic doses of medication, and

perhaps periodic bouts of physical therapy. The Court finds that an award of $65,000.00 for future medical expenses is warranted in this matter.

*EMPLOYMENT OF SCOTT DELAHOUSSAYE*

74. At the time of Scott Delahoussaye's injury, he was earning $58,438.00 annually.

75. Delahoussaye has not returned to work, and has sustained wage losses in the amount of $182,732.00.

76. The Court finds Scott Delahoussaye can return to work in a low-sedentary type position.

77. Scott Delahoussaye has above-average intelligence.

78. The Court finds as a factual matter that Scott Delahoussaye can find low/sedentary type employment in the the range of $12 per hour.

79. The Court further finds as a factual matter that Scott Delahoussaye has sustained future wage loss in the amount of $454,296.17.

*GENERAL DAMAGES OF SCOTT DELAHOUSSAYE*

80. The Court finds as a factual matter, that Scott Delahoussaye has sustained an injury to L5-S1 disk. The Court further finds that Scott Delahoussaye suffers from periodic, intermittent pain with his back.

81. The Court further finds as a factual matter that the pain of Scott Delahoussaye is

exaggerated and is not constant as he reported to his physicians.

82. The Court further finds as a factual matter that Delahoussaye's back injury has not significantly impacted his relationship with his son or the activities he is allowed to engage in with his son.

83. The Court further finds as a factual matter that Delahoussaye can continue to participate in activities with his son and will continue to be able to monitor the school activities and extracurricular activities of his son.

84. The Court deems that $200,000.00 is a sufficient award for general damages.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to 28 U.S.C. §1333 which provides original jurisdiction over admiralty and maritime claims. (*see* Doc. 180.)

### *BORROWED EMPLOYEE*

2. Whether an individual qualifies as a "borrowed employee" is an issue of law determined by nine separate factors: (1) who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation; (2) whose work is being performed; (3) was there an agreement, understanding or meeting of the minds between the original and the borrowing employer; (4) did the employee acquiesce in the new work

situation; (5) did the original employer terminate his relationship with the employee; (6) who furnished tools and place for performance; (7) was the new employment over a considerable length of time; (8) who had the right to discharge the employee; (9) who had the obligation to pay the employee. *See Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969). No single factor or set of factors is determinative in establishing a "borrowed employee" relationship, however the central factor is that of control. *Brown v. Union Oil Co. of Calif.*, 984 F.2d 674, 676 (5th Cir. 1993).

3.  The party asserting the borrowed servant relationship, in this case Performance, has the burden of proving the relationship. *See Franks v. Assoc'd Air Center, Inc.*, 663 F.2d 583, 587 (5th Cir. 1991).

4.  Considering all of the *Ruiz* factors, the Court finds as a matter of law that Andow was not the borrowed employee of Crescent or Boutte.


*GENERAL MARITIME LAW CLAIM*

5.  It is well established in general maritime law that an employer is vicariously liable for the wrongful acts committed by employees while acting in the course and scope of their employment. *Stoot v. D&D Catering Serv., Inc.*, 807 F.2d 1197, 1199 (5th Cir. 1987).

6.  "The analysis of a maritime tort is guided by general principles of negligence law." *In re Signal Intern, LLC*, 579 F.3d 478, 491 (5th Cir. 2009) (quoting *Consol. Aluminum Cor. v. C.F.*

*Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)).  Thus, "[t]o establish maritime negligence, a plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury."  *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1999)).

7.    As a matter of the law it was the duty of Andow to operate the crane in a safe manner and if it could not be done safely then Andow was obligated to stop a lift until it could be done safely.  API RP 2d; 30 C.F.R. 250.108.

8.    The undertaking of a blind lift, in and of itself, is not negligent.  In undertaking a blind lift, the crane operator has the duty to ensure that his signalman has a full view of the lift.  *Id.* It is the duty of the signalman to properly relay signals to the crane operator during a blind lift.  *Id.*  At the beginning of the lift, Andow had not breached his duty.

9.    Andow breached his duty to operate the crane safely when he failed to stop the lift after he noticed that his signalman, Richard Boutte, was out of position and did not have a clear view of the lift such that the lift was unsafe.

10.   Boutte breached his duty when he failed to: (1) monitor the position of the crane; (2) properly relay the signals between Delahoussaye and Andow; and (3) give Andow the "all stop" signal when Delahoussaye gave that signal from the boat.  Boutte was the only person who was supposed to be relaying signals to Andow and his failure to properly discharge that

responsibility was negligent.

11. "Comparative fault has long been the accepted risk-allocating principle under the maritime law." *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1428 (5th Cir. 1983).

12. Both Boutte and Andow owed plaintiff a duty to properly and safely perform the blind lift on August 22, 2009. Boutte and Andow both breached their duties in performing the blind lift on August 22, 2009. The breach of their duties could foreseeably cause Plaintiff's injury. Therefore, this Court finds that Boutte is 85% at fault and Andow is 15% at fault in causing Delahoussaye's injuries.

**CONCLUSION**

Based on the above findings of fact and conclusions of law, the Court finds that Richard Boutte was 85% at fault in causing plaintiffs injuries, and Shalico Andow was 15% at fault in causing Plaintiff's injuries The Court finds that Plaintiff is entitled to recover: $67,528.49 in past medical expenses; $65,000.00 in future medical expenses; $454,296.17 in future wage loss; and $200,000.00 in general damages. This totals $786,824.66. Performance Energy Services, LLC's, as the employer of Shalico Andow, liability is reduced by 85% for the fault of Richard John Boutte. Thus, Plaintiff is entitled to a total amount of $118,023.69 from Performance Energy Services, LLC.

New Orleans, Louisiana on this 9th day of November, 2012.

JANE TRICHE MILAZZO
UNITED STATES DISTRICT COURT JUDGE